```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Mary Catherine McKay,              :

        Plaintiff,                 :

   v.                              :    Case No. 2:14-cv-1061

                                   :    JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,        Magistrate Judge Kemp

        Defendant.                 :
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Mary Catherine McKay, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. That application was filed on October 10, 2010, and alleged that Plaintiff became disabled on January 16, 2010. That is one day after a prior application was denied. Plaintiff also appealed that denial to this Court, and the Court overruled her statement of errors and entered judgment for the Commissioner in that case on August 30, 2012. See McKay v. Comm'r of Social Security, 2012 WL 3777653 (S.D. Ohio August 30, 2012).

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on February 26, 2013. In a decision dated March 22, 2013, the ALJ denied benefits. That became the Commissioner's final decision on June 12, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on December 29, 2014. Plaintiff filed her statement of specific errors on February 6, 2015, to which the Commissioner responded on April 13, 2015. Plaintiff filed a

reply brief on April 30, 2015, and the case is now ready to decide.

    II.   <u>The Lay Testimony at the Administrative Hearing</u>

Plaintiff, who was 54 years old at the time of the administrative hearing and who has a law degree, testified as follows. Her testimony appears at pages 37-54 of the administrative record.

Plaintiff first testified that she lived in Marietta, Ohio, with a roommate, and was really not able to live by herself. She had not worked since 2005, and had taken inactive status in 2007 or 2008 at the suggestion of her doctor. She had experienced problems with her ability to practice law even before 2005.

Focusing on her symptoms since her alleged onset date of January 16, 2010, Plaintiff said that she continued to have problems working with other people. She had lost a job because of lack of people skills. Also, her father died in 2010 and she suffered from depression thereafter. It caused her to stay in her house and to become angry and feel useless. She did not leave her house more than half the time in 2010. However, she did not share those problems with her doctor, and she was not in psychotherapy at the time. She was taking medication to manage both manic and depressive symptoms, with some effect.

During 2010, Plaintiff had problems with task completion. She was easily distracted both while performing tasks and conversing with people. She said that her roommate did all the cooking and laundry and also helped her to remember to take her medications. On a typical day, Plaintiff would check emails on her computer, play solitaire, shower, dress, and do some shopping. She sometimes drove to her mother's home, and she was able to fix a sandwich for herself. She did some reading but found it hard to focus, and also did some word puzzles.

Plaintiff's roommate also testified at the hearing. She and

Plaintiff had roomed together since 1993. During 2010, she noticed that Plaintiff had mood swings and might not leave the house for weeks at a time. Plaintiff's concentration on tasks was "horrible." She also had a hard time relating to others. (Tr. 56-61).

### III. The Medical Records

The medical records in this case are found beginning on page 255 of the administrative record. The pertinent records can be summarized as follows. Because Plaintiff's statement of errors focuses on the evidence relating to her psychological impairments, this summary will deal primarily with records relating to that issue, and particularly records dealing with her condition after January 15, 2010, the date of the prior adjudication.

There are a number of treatment notes from Behavioral Medicine, beginning as far back as November 20, 1998. The first one dated after her onset date, which reflects a visit of March 2, 2010, (presumably to Dr. Byler, who was treating her at that time) contains a fairly extensive discussion of the fact that Plaintiff had applied or was considering applying for work as a legal assistant, including her concern about whether to share her diagnosis of bipolar disorder with her prospective employer. She said that she was concerned about her focus and concentration being variable, good some days but not others. She also denied any hypermanic episodes. (Tr. 273-74). On that note, her mental status, as represented by various matters listed on the left-hand side, appeared to be within normal limits.

The next mental health record, in chronological sequence, is dated March 29, 2010 and appears to reflect her first appointment with Dr. Hill, to whom Plaintiff was referred by Dr. Byler. It begins by describing Plaintiff as "pleasant cooperative woman." At that time, she was taking four different medications. She

said she had not worked in several years due to difficulties with concentration. She was not depressed at that time but reported that depression could occur at any time for no reason. If not depressed, Plaintiff said she visited her mother, did yard work, or read. If depressed, she did nothing. Her diagnoses included bipolar disorder and anxiety disorder. Dr. Hill continued her medications except for Rozerem. Dr. Hill saw her again on May 24, 2010, at which time Plaintiff reported feeling "down" with decreased concentration and energy. He increased her medications, which, she reported two months later, had helped somewhat, but she was still grieving the loss of her father. The note from that visit also indicated that Plaintiff could not afford a therapist, although Dr. Hill thought that would help her deal with her grief. On October 11, 2010, Dr. Hill said she was "still doing fairly well" and that she had spent some time helping her mother and doing yard work. Her sleep and appetite were good. Dr. Hill wrote a letter on November 11, 2010, indicating that Plaintiff's prognosis was guarded and she had been unable to work for many years due to poor concentration. Her response to treatment was fair to good, her understanding was good, and her memory and sustained concentration and persistence were poor. (Tr. 346-51). He also filled out a questionnaire on August 25, 2011, indicating many marked or extreme functional limitations in all work-related areas, including making occupational adjustments, making performance adjustments, and making personal social adjustment. He noted again that her concentration was poor and that her mood was extremely variable. (Tr. 370-72). Additionally, he related all of these limitations to the time before Plaintiff's insured status expired. (Tr. 445).

    A consultative psychological evaluation was done by Dr. Griffiths on January 25, 2011. Plaintiff drove herself to the

appointment. She reported that she stopped working because she could not deal with clients and could not focus. She also said she had difficulty sleeping due to racing thoughts. She told Dr. Griffiths she had many friends and visited with her younger brother, her mother, or neighbors. She had problems paying attention when reading. She was able to fix meals, do chores, and shop for groceries. She appeared polite and cooperative but seemed to be depressed and her affect was flat. However, she denied being depressed, instead stating that she felt tired. She rarely cried and enjoyed the company of others. She reported mood swings and anxiety as well as having periods of time where she was unable to leave the house. Her short-term memory was poor. Dr. Griffiths rated Plaintiff's GAF at between 51 and 60 based on the symptoms she reported and her functioning level, but gave her a final GAF rating of 51. He diagnosed bipolar disorder and anxiety disorder. Finally, he viewed her as having a moderate limitation in her ability to relate to others, as being able to understand, remember, and follow simple instructions, as moderately limited in her ability to maintain attention, concentration, persistence, and pace, and as moderately limited in her ability to deal with work stress. He said such stress could lead to increased anxiety and decreased concentration, exacerbate depressive symptomatology leading to withdrawal and slowed work performance, and lead to manic-like behavior. (Tr. 360-65).

 There are also some records from L&P Services, a mental health service agency. A note from February 21, 2011, stated that Plaintiff did not have depression or mania and that her mental status was essentially normal. (Tr. 367-69). There are later notes from that agency but all are dated well after the expiration of Plaintiff's insured status.

 In addition to these examination or treatment records, two

state agency psychologists reviewed the records and expressed an opinion as to Plaintiff's residual functional capacity.  The first, Dr. Tangeman, viewed Plaintiff as moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Additionally, Plaintiff had social interaction limitations involving dealing with the general public and some moderate adaptation limitations including responding appropriately to changes in the work setting and reduced stress tolerance.  She could, however, perform routine tasks in a static work setting.  Dr. Tangeman noted that he had given great weight to the findings of the consultative examiner (Dr. Griffiths). (Tr. 93-95).  The second reviewer, Dr. Bergsten, concurred.  (Tr. 111-13).

## IV.   The Vocational Testimony

Nancy Shapero was the vocational expert in this case.  Her testimony begins on page 62 of the administrative record.  Ms. Shapero first testified that Plaintiff's past work as a lawyer was sedentary and skilled.

Ms. Shapero was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level.  The person could not climb ladders, ropes, and scaffolds and had to avoid hazards including heights and machinery.  She was limited to the performance of routine, repetitive tasks and restricted to only incidental public contact.  She could interact superficially with supervisors and coworkers.  According to Ms. Shapero, someone with those limitations could not work as a lawyer but

could still work as a price marker, sorter, or packer.  Those jobs could be done by someone who could not tolerate any interaction with the public.

Ms. Shapero was asked if someone who could not complete an eight-hour work day due to social phobia and poor concentration could work.  She said no.  The same would be true for someone with extreme limitations in a large number of work-related functions such as using judgment, dealing with work stress, maintaining attention and concentration, and completing a normal workday and work week without interruption from psychologically-based symptoms.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11-27 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements of the Social Security Act through December 31, 2010.  Next, she found that Plaintiff had not engaged in substantial gainful activity since her onset date of January 16, 2010.

Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including problems of the back, bipolar disorder, major depression, and anxiety disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level but she could not climb ladders, ropes, or scaffolds, and had to avoid hazards including heights and machinery.  Additionally, she could do

routine repetitive tasks and could have only incidental contact with the public and only superficial interactions with supervisors and coworkers.

The ALJ found that, with these restrictions, Plaintiff could not do her past relevant work. However, she could do the three jobs identified by the vocational expert - price marker, sorter, and packer. The ALJ further found that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

## VI. Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises three issues. She asserts (1) the ALJ erred in failing to include limitations in her residual functional capacity assessment relating to Plaintiff's mental impairments; (2) the ALJ erred by failing explicitly to address the credibility of Plaintiff's roommate, who testified at the administrative hearing; and (3) the ALJ did not follow the "treating physician" rule with respect to Dr. Hill. These contentions are reviewed under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Psychological Limitations

Plaintiff's first statement of error addresses the ALJ's mental residual functional capacity finding. As described above, the ALJ found that Plaintiff could do routine repetitive tasks and could have only incidental contact with the public and only superficial interactions with supervisors and coworkers. She found no other limitations arising from Plaintiff's mental impairments. Plaintiff argues that these limitations did not reflect any impairment in the area of maintaining concentration, persistence, and pace, and she cites to Ealy v. Comm'r of Social Security, 594 F.3d 504 (6th Cir. 2010), as well as several decisions of this Court which applied Ealy, as authority for the proposition that work which involves only simple tasks and little interaction with the public may have focus and pace requirements that someone with Plaintiff's limitations might not be able to satisfy.

One of the premises of Plaintiff's argument is that the ALJ found focus and pace limitations but did not include them in either the RFC determination or in the hypothetical questions posed to the vocational expert. The Commissioner appears to acknowledge that the ALJ did recognize those limitations but

-9-

argues, in somewhat conclusory fashion, that "the ALJ properly accounted for Plaintiff's moderate limitations in concentration, persistence, or pace in propounding hypothetical questions to the VE."  Memorandum in Opposition, Doc. 18, at 13.  The Commissioner also asserts that no error occurred because an ALJ does not have to include, in either an RFC finding or a hypothetical question, "summary conclusions made by the medical source opinions of record."  Id.

    There are two reasons why the Commissioner's position on this issue is not persuasive.  First, the ALJ did not include any limitations on concentration, persistence, or pace in the hypothetical questions asked to Ms. Shapero.  The questions asked nothing about the work setting within which the simple, repetitive tasks which Plaintiff was capable of doing could be performed.  The state agency reviewers both translated the moderate limitations they imposed into certain workplace restrictions, such as a static work setting.  They clearly concluded that the limitations on Plaintiff's ability to tolerate work stress affected her ability to function in the workplace in a way which went beyond the limitation to simple, repetitive tasks, and that is entirely consistent with Ealy.

    What the Commissioner really appears to be arguing is that even though the state agency reviewers found these limitations to exist, the ALJ did not, and that any error made by the ALJ in disregarding these limitations was harmless because it is the ALJ, not the state agency reviewers, who has the final say on a claimant's residual functional capacity.  The latter part of this statement is true, but the RFC finding must still be based on substantial evidence.  Here, every medical source - treating, examining, and reviewing - concluded that Plaintiff had at least moderate restrictions on her ability to concentrate, attend, work at pace, and tolerate work stress.  A finding to the contrary would not be supported by the record.  And, in fact, it appears

that the ALJ appreciated the state of the record on this issue; she said, in the administrative decision, that "[w]hile the undersigned does find that the claimant has some limitations in the areas of concentration and persistence, the evidence supports no more than a moderate limitation." (Tr. 22). In light of both the evidence supporting such a finding and the ALJ's explicit crediting of that evidence, her failure to include any persistence or pace-based limitation in either the RFC finding or the hypothetical questions asked to the vocational expert is clear error and requires a remand.

### B. Lay Witness Credibility

In her second statement of error, Plaintiff takes issue with the way in which the ALJ dealt with the testimony of her roommate, who was one of the two lay witnesses to testify at the administrative hearing. Plaintiff characterizes her testimony as "other source" opinion, which an ALJ must consider under Social Security Ruling 06-03p, and argues that "the ALJ's failure to consider and weight (sic) her testimony was reversible error." Statement of Errors, Doc. 15, at 17.

The ALJ devoted a paragraph to this testimony, recounting it in some detail. (Tr. 19). It is apparent that the ALJ was both aware of the testimony and its content, including the witness's statements about how Plaintiff's mental impairment has affected her activities of daily living. Plaintiff's argument appears to be that if the ALJ did not explicitly say that, in addition to summarizing the testimony, she "considered" it and gave it some specific amount of weight, that is a violation of SSR 06-03p or the ALJ's general duty to consider all of the relevant evidence no matter who it comes from.

The Commissioner has the better argument on this issue. An ALJ is only required to articulate his or her conclusions in specific ways when a regulation, such as 20 C.F.R. §404.1527(c), mandates it. As to lay witness testimony, some courts have held

that "where an ALJ discusses at length the objective medical evidence, he is not required to include a separate review of a third party statement."  See, e.g., Dixon v. Colvin, 2015 WL 5722794, *7 (E.D. Ky. Sept. 29, 205).  Additionally, while it is true that the ALJ must consider all of the evidence, reversible error does not occur unless it appears from the record that the ALJ simply failed to take into account at all some item of evidence which materially bears on the ultimate resolution of the case.

   While the ALJ in this case may not have fully complied with the precept that "[i]f lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness," Maloney v. Comm'r of Social Security, 480 Fed.Appx. 804, 810 (6th Cir. May 15, 2012), the Court finds any error to be harmless.  The testimony in question was largely cumulative of Plaintiff's own testimony, which the ALJ did not find fully credible.  It was also inconsistent with the ALJ's conclusions about Plaintiff's functional capacity as determined after a review of both Plaintiff's testimony and the medical evidence.  The absence of any "magic words" indicating that the ALJ actually considered the testimony which she acknowledged and summarized is simply not a basis on which to return the case to the ALJ for further proceedings, even if it would have been better had the ALJ stated some cogent reason for giving little or no weight to the testimony (which, obviously, is what the ALJ actually did).  There may be cases where the absence of any further discussion of a lay witness's testimony is reversible error, but, for the reasons stated here, this is not one of them.  The Court therefore finds no merit to the second statement of error, but, of course, on remand, the ALJ should comply with the directive from Maloney that she supply witness-specific reasons for her decision not to credit the testimony from Plaintiff's roommate.

### C.  The Treating Source Opinion

Because the case should be remanded for other reasons, the Court will deal with the treatment of Dr. Hill's opinions in relatively brief fashion.  The parties, as is the case in many social security appeals, express different views about whether the ALJ both had and articulated valid reasons for giving less than controlling weight to the opinions of a treating source.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, Dr. Hill's opinion, if credited, is clearly work-preclusive.  The ALJ discounted it because, in her view, it was

not consistent with the progress notes from L&P Services which showed that Plaintiff related well to others with no depression or mania, because "additional treatment records consistently indicated the claimant was doing well with medication," and because she had undergone only conservative treatment without therapy sessions, emergency room treatment, or psychiatric hospitalization. (Tr. 23).

There are a number of problems with this articulation of the ALJ's rationale. The "additional treatment records" relied on by the ALJ are not identified. Using a single note from a mental health provider, made after the expiration of Plaintiff's insured status, as a basis for rejecting the opinion of a longer-term treating source is questionable, especially when the ALJ discounted other notes from the same provider as "being based only on the claimant's subjective complaints at the time." (Tr. 24). The lack of more aggressive treatment is also a tenuous rationale, especially in light of evidence in the record (which the Court has cited above) indicating that Plaintiff did not seek counseling, at least in 2010, for financial reasons. While a refusal to seek treatment might indicate that a mental impairment is not as severe as a claimant contends, see Donathan v. Astrue, 264 Fed.Appx. 556 (9th Cir. Jan. 14, 2008), the record in this case is not so clear. The ALJ's somewhat oblique reference, in a different part of the administrative decision, to Plaintiff's ability to do some household chores or to engage in some minimal computer use as a basis for finding that she had the mental capacity to engage in full-time work, despite Dr. Hill's view to the contrary, is not particularly compelling either. There may be valid reasons to discount some of Dr. Hill's more extreme views, but the ALJ did not articulate them in a way that permits the Court to understand them and conclude that they had substantial support in the record. Consequently, any decision made on remand should fully comply with the ALJ's duty both to

-14-

articulate clearly the basis for the weight given to Dr. Hill's opinion and to support that articulation with acceptable reasons that find substantial support in the record.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge